## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

EMILY B.,[1]

                                        Plaintiff,

           v.                                          3:19-CV-657
                                                       (ATB)

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

PETER A. GORTON, for Plaintiff
AMY BLAND, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

### MEMORANDUM-DECISION AND ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 7).

## I.    PROCEDURAL HISTORY

Plaintiff filed her application for Disability Insurance Benefits ("DIB") on June 1, 2016,[2] alleging that she became disabled beginning on July 1, 2015. (Administrative Transcript ("T.") 139-40).  Plaintiff's claim was denied initially on July 13, 2016. (T.

---

[1] In accordance with recent guidance from the Committee on Court Administration and Case Management of the Judicial Conference of the United States, which was adopted by the Northern District of New York in June 2018 in order to better protect personal and medical information of non-governmental parties, this Memorandum-Decision and Order will identify the plaintiff using only her first name and last initial.

[2] The plaintiff's actual application for DIB, lists an application date of June 2, 2016, while the initial denial documents and the ALJ list a June 1, 2016 application date. (T. 11, 65).  The discrepancy has no effect on the court's decision.

65, 72-76).  Plaintiff made a timely request for a hearing, which was held by video conferencing on June 20, 2018 before Administrative Law Judge ("ALJ") Kenneth Theurer. (T. 36-64).  Plaintiff appeared with her representative and testified at the hearing. (*Id.*)  The ALJ also heard testimony from Vocational Expert ("VE") David A. Festa. (T. 59-64).  ALJ Theurer issued an unfavorable decision on July 16, 2018. (T. 11-19).  The ALJ's decision became the Commissioner's final decision when the Appeals Council denied plaintiff's request for review on April 8, 2019. (T. 1-6).

## II.   **GENERALLY APPLICABLE LAW**

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such severity
> that he is not only unable to do his previous work but cannot, considering
> his age, education, and work experience, engage in any other kind of
> substantial gainful work which exists in the national economy, regardless
> of whether such work exists in the immediate area in which he lives, or
> whether a specific job vacancy exists for him, or whether he would be hire
> if he applied for work

42 U.S.C. § 1382(a)(3)(B).  The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

2

> First, the [Commissioner] considers whether the claimant is currently
> engaged in substantial gainful activity. If he is not, the [Commissioner]
> next considers whether the claimant has a "severe impairment" which
> significantly limits his physical or mental ability to do basic work
> activities. If the claimant suffers such an impairment, the third inquiry is
> whether, based solely on medical evidence, the claimant has an impairment
> which meets or equals the criteria of an impairment listed in Appendix 1 of
> the regulations. If the claimant has such an impairment, the
> [Commissioner] will consider him disabled with-out considering vocational
> factors such as age, education, and work experience… Assuming the
> claimant does not have a listed impairment, the fourth inquiry is whether,
> despite the claimant's severe impairment, he has the residual functional
> capacity to perform his past work. Finally, if the claimant is unable to
> perform his past work, the [Commissioner] then determines whether there
> is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520,

416.920. The plaintiff has the burden of establishing disability at the first four steps.

However, if the plaintiff establishes that his impairment prevents him from performing

his past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

### B. Scope of Review

In reviewing a final decision of the Commissioner, a court must determine

whether the correct legal standards were applied and whether substantial evidence

supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v.*

*Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).

It must be "more than a scintilla" of evidence scattered throughout the administrative

record. *Id.* However, this standard is a very deferential standard of review, "even more

so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

3

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.  FACTS

Plaintiff was born on December 9, 1990, making her 25 years old at the time of her application, and 27 years old on the date of the ALJ's hearing. (T. 17).  Plaintiff testified that she lived in a house with her mother and four dogs. (T. 45).  She has a driver's license and a car. (*Id.*)  Plaintiff obtained an undergraduate college degree from Binghamton University in 2014 and a Masters Degree in Education from Mercy College in 2016. (T. 46-47).  While plaintiff was attending Binghamton University, she worked at a children's home as a "one on one aid for a student," three to four days a week, for

4

six to eight hours per day. (T. 47-48).  Plaintiff also had experience working as a substitute teacher. (T. 48).  Plaintiff worked as a substitute teacher until approximately a year prior to the ALJ's hearing. (*Id.*)  Substitute teaching involved going to a school to teach after being called by the school.  Plaintiff testified that the school called "quite often," but that she only went in between five and eight times because plaintiff had trouble with insomnia, and she did not always feel that she could go in.  She also stated that her failure to accept some of the calls was, in part, due to the anxiety of being called first thing in the morning. (*Id.*)

Plaintiff testified to having several impairments which impacted her ability to work, including Lyme Disease, Hashimoto's Thyroiditis,[3] Fibromyalgia, Asthma, Anxiety, Depression, and Attention Deficit Hyperactivity Disorder ("ADHD"). (T. 49-52).  Plaintiff testified that she was being treated for Lyme Disease by Dr. Mast with antibiotics and some "herbals," but that one of her primary care providers "questioned that diagnosis" because of the "test results," and because the provider believed that her symptoms were "more emotional." (T. 49, 50).  Plaintiff testified that she was not taking any medication for her thyroid condition because there was currently no treatment for the elevated antibodies. (T. 50).  Plaintiff testified that she had seen a "rheumatologist"[4] for the Fibromyalgia, but the doctor could not help her. (T. 50).  Plaintiff testified that she used a rescue inhaler for her asthma "maybe four or five times a month." (T. 51).

---

[3] Hashimoto's Thyroiditis is an autoimmune disease affecting the thyroid gland that can cause the thyroid to be underactive because it cannot make sufficient thyroid hormones. https://www.niddk.nih.gov/health-information/endocrine-diseases/hashimotos-disease.

[4] Plaintiff answered in the affirmative when the ALJ asked whether she had seen a rheumatologist for the Fibromyalgia, but then plaintiff stated that it was a "Nurse Practitioner." (T. 50).

Plaintiff stated that she was originally diagnosed with anxiety and depression when she was eight years old. (T. 55).  Plaintiff testified that she began treating with Dr. Monastra for her anxiety and depression a few weeks prior to the ALJ's hearing, and that the only medication that she took at the time of the hearing was Ativan for anxiety, although she had taken multiple medications for anxiety and depression through the years. (T. 51, 52).  Plaintiff testified that her primary care provider prescribed the Ativan. (T. 52).  Plaintiff was not taking any medication for her ADHD. (*Id.*)  Plaintiff stated that, prior to Dr. Monastra, she was seeing a counselor "all along," but it had been "a year or two since I've seen a psychiatrist." (T. 52).  Plaintiff stated that she was hospitalized twice for her mental health conditions, once in 2006, when she was sixteen years old, and again in 2015. (*Id.*)

Plaintiff stated that she got up in the morning "between 10:00 and 11:00," took a shower, and let the dogs out. (T. 53).  Sometimes, she would pick up around the house a little bit and then rest in a recliner.  Sometimes, she went back upstairs to take a nap, and then would repeat the same activities: letting out the dogs and picking up around the house, resting in between. (*Id.*)  Later, plaintiff testified that she took naps approximately two to four times per day for approximately an hour each time. (T. 57).  Plaintiff went to bed "between 10:00 and 11:00," but stated that it took her about two hours before she fell asleep. (*Id.*)  She stated that she was up several times during the night due to panic attacks. (*Id.*)  Plaintiff used social media, occasionally cooked and went to the store. (T. 54).  She testified that she did not go out with friends, but would socialize with them "a little bit" on Facebook. (*Id.*)

The ALJ asked plaintiff why she believed that she could not work. (*Id.*)  Plaintiff

stated that the insomnia made it hard to sleep at night, and that she woke up during the night with panic attacks. (*Id.*)  She stated that no one was treating her for the insomnia because she had "so many things going on with the physical and the emotional, that a lot of it, from what I'm told, comes back to the Lyme disease." (T. 54-55).  Plaintiff testified that, even though her tests for Lyme disease were negative, her doctor told her that the tests were less than 30% accurate, and that she may have had the disease for so long, "it's not showing up." (T. 55).

In response to questioning from her attorney, plaintiff testified that some of her doctors believe that the anxiety and depression are causing plaintiff's other symptoms, and that she only feels well enough to go to work a couple of times per month. (T. 56).  Plaintiff testified that, when she was depressed, she felt worthless and hopeless, and she had no energy or motivation to "get up and do anything." (T. 56).  Plaintiff experienced panic attacks due to her anxiety. (T. 57).  When she was having a panic attack, she felt like she was having a heart attack.  She felt like she was dying.  Her heart would race, she would cry, and she would rock back and forth, unable to sit still. (T. 57).  Plaintiff stated that ultimately, "the fatigue and the joint pain is . . . what really, really gets me." (*Id.*)  "[I]t's hard to just get up and get moving and then be so tired throughout the day." (*Id.*)

Plaintiff told the ALJ that even though she had depression and anxiety most of her life, those conditions had gotten worse. (T. 58).  When she was younger, her problem was that she had a fear of seeing things that were not there, but as she got older, her depression got worse, making her feel worthless and making her cry "constantly." (T. 58-59).

The ALJ heard testimony from VE David A. Festa.  VE Festa testified that plaintiff's previous work would be considered an "Attendant" at a "Children's Institution."  This work was considered semiskilled and customarily performed as medium work. (T. 60).  The ALJ's first hypothetical assumed an individual who should avoid concentrated exposure to smoke, dust, or respiratory irritants. (T. 61).  The individual  would also be limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production requirements, involving only simple work-related decisions, with few, if any, workplace changes. (T. 61).

VE Festa testified that, based on the ALJ's first hypothetical, the individual could not perform plaintiff's past relevant work. (T. 61).  However, the individual could perform the occupations of Cook Helper (unskilled/medium work); Office Helper (unskilled/light); and Addresser (unskilled/sedentary). (T. 61).  The ALJ's second hypothetical began with the same environmental restrictions, but contained more detail with respect to the individual's mental abilities.

The second hypothetical stated that the individual retained the ability to understand and follow simple instructions and directions, could perform simple tasks "with supervision [and] independently," maintain attention and concentration for simple tasks, or regularly attend to a routine and maintain a schedule. (T. 62).  The individual could also relate to, and interact with others, to the extent necessary to carry out a simple task, but should avoid work requiring more complex interaction or a joint effort to achieve a work goal. (*Id.*)  The job should not involve direct interaction with the public, but the individual would not need to be isolated from the public.  Finally, the hypothetical individual would be able to handle reasonable levels of simple work-

related stress, meaning that the individual could make occasional simple decisions, directly related to the completion of her tasks in a stable, unchanging work environment. (*Id.*)  Although there were no exertional restrictions stated by the ALJ, he asked the VE to "identify jobs across the exertional spectrum." (*Id.*)

In response, VE Festa testified that all the jobs that he identified in response to the first hypothetical would still be available to an individual with the restrictions described in the second hypothetical. (T. 63).  The VE also testified that an individual who was "off task" more than 10% of the time or had more than one unexcused absence per month would be "unemployable." (T. 63-64).

Plaintiff has summarized the medical evidence in his brief. (T. 2-7).  Rather than summarizing the records at the outset, I will refer to the pertinent records during my discussion of the plaintiff's arguments.

## IV.   **THE ALJ'S DECISION**

After finding that plaintiff did not engage in substantial gainful activity ("SGA") after her alleged onset date,[5] the ALJ found that plaintiff had the following severe impairments: Attention Deficit Hyperactivity Disorder ("ADHD"), Anxiety Disorder, Depressive Disorder, and Asthma. (T. 13-14).  The ALJ also found that, although plaintiff had a history of obesity and Hashimoto's Thyroiditis, neither of these impairments were severe. (T. 14).  Finally, although plaintiff attributed pain and fatigue to Fibromyalgia and Lyme Disease, her medical records did not contain the findings necessary to establish Fibromyalgia, and her diagnostic tests for Lyme Disease have

---

[5] Plaintiff worked after her alleged onset date, but the ALJ found that her earnings fell below SGA levels. (T. 13).

been negative. (*Id.*)  Thus, the ALJ did not find that either condition was a "medically determinable impairment." (*Id.*)

Next, the ALJ found that plaintiff's severe impairments did not rise to the level of Listed Impairments at step three of the sequential evaluation. (T. 14-15).  The ALJ considered Listing 3.03 (Asthma), 12.04 (Depressive Disorders), 12.06 (Anxiety and Obsessive-Compulsive Disorders), and 12.11 (Neurodevelopmental Disorders).  The ALJ evaluated plaintiff's mental disorders according to the special procedure in 20 C.F.R. § 404.1520a. (*Id.*)  The ALJ determined that plaintiff did not have sufficiently severe limitations in any of the broad areas of functioning listed in the regulation, known at the "B" criteria. (T. 15).  The ALJ found mostly "mild" limitations, with a "moderate" limitation only in the area of concentration, persistence, and pace. (*Id.*)[6] The ALJ also examined the plaintiff's ability to adjust and adapt to changes in her environment, known as the "C" criteria, finding that the evidence failed to establish that plaintiff only had marginal adjustment. (*Id.*)

At step four, the ALJ found that plaintiff had the RFC to perform a full range of work at all exertional levels, except that she needed to avoid concentrated exposure to smoke, dust, and other respiratory irritants. (T. 16).  Mentally, she could perform simple, routine, and repetitive tasks in a work environment, free of fast-paced production requirements and that involved only simple, work-related decisions, with few, if any, workplace changes. (*Id.*)

---

[6] The ALJ stated that these findings, known as the "B" criteria were only used to rate the severity of a mental impairment, but did not constitute an RFC finding, and that further evaluation at steps four and five was required.  (*Id.*)

The ALJ then considered the testimony of VE Festa, who stated that, based on the RFC above, plaintiff could not perform her previous work. (T. 17).  However, based on the VE's testimony, the ALJ also found at step five of the sequential analysis, that plaintiff could perform other work in the national economy. (T. 18).  He identified the jobs of cook helper, office helper, and addresser. (*Id.*)  The ALJ, therefore, found that plaintiff was not disabled for purposes of the statute. (T. 18-19).

## V.   **ISSUES IN CONTENTION**

Plaintiff raises the following arguments in support of her position that the ALJ's decision is not supported by substantial evidence:

1.   The Appeals Council failed to properly weigh the reports of two treating physicians that were supplied after the ALJ's decision was issued. (Pl.'s Br. at 8-11) (Dkt. No. 9).

2.   The ALJ failed to properly consider the time that plaintiff would be "off-task" or absent from work. (Pl.'s Br. at 11-13).

3.   The ALJ misstated the evidence in the record. (Pl.'s Br. at 14).

4.   The ALJ failed to account for limitations in responding appropriately to "ordinary work stressors in a work setting with simple tasks." (Pl.'s Br. at 14).

5.   The ALJ's step five determination is not supported by substantial evidence. (Pl.'s Br. at 15).

6.   The ALJ formed his RFC without any supporting medical opinion. (Pl.'s Br. at 15-16).

Defendant argues that the Commissioner's final decision is supported by substantial evidence, countering each of plaintiff's arguments. (Def.'s Br.) (Dkt. No. 14).  Plaintiff has filed a reply. (Pl.'s Rep. Br.) (Dkt. No. 17).  For the following reasons,

this court agrees with plaintiff and will order remand for further consideration by the agency.

## VI.   **RFC/WEIGHING EVIDENCE**

### A.   **Legal Standards**

#### 1.   **RFC**

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule.  *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).  An ALJ must specify the functions

plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities. *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004). The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence. *Natashia R. v. Berryhill*, No. 3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2.     Weight of the Evidence/Treating Physician

In making a determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996). Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings." The responsibility for determining these issues belongs to the Commissioner. *See* SSR 96-5p, 1996 WL 374183, at *2. These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d). The ALJ must clearly state the legal rules that he applies and the weight that he accords the evidence considered. *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2

(S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

"Although the treating physician rule generally requires deference to the medical opinion of a claimant's treating physician, . . . the opinion of the treating physician is not afforded controlling weight where . . . the treating physician issued opinions that are not consistent with other substantial evidence in the record . . . ." *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). If an ALJ decides not to give the treating source's records controlling weight, then he must explicitly consider the four *Burgess* factors: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019) (quoting *Burgess v. Astrue*, 537 F. 3d 117, 120 (2d Cir. 2008)). "[T]he ALJ must 'give good reasons in [its] notice of determination or decision for the weight [it gives the] treating source's [medical] opinion.' " *Id.* at 96 (citing *Halloran v. Barnhart*, 362 F.3d at 32). Should an ALJ assign less than controlling weight to a treating physician's opinion and fail to consider the above-mentioned factors, this is a procedural error. *Id.* It is impossible to conclude that the error is harmless unless a "searching review of the record . . . assures us that the substance of the treating physician rule was not traversed." *Id.*

### 3.    Appeals Council Review

"Once evidence is added to the record, the Appeals Council must then consider the entire record, including the new evidence, and review a case if the 'administrative

14

law judge's action, findings, or conclusion is contrary to the weight of the evidence currently of record.'" *Lesterhuis v. Colvin*, 805 F.3d 83, 86 (2d Cir. 2015) (quoting 20 C.F.R. § 404.970(b)).  "The Appeals Council is obligated to consider 'new and material evidence.'" *Stratton v. Colvin*, 51 F. Supp. 3d 212, 218 (N.D.N.Y. 2014) (citing 20 C.F.R. § 404.970(b)).  "New evidence is 'material' if it is: '(1) relevant to the claimant's condition during the time period for which benefits were denied and (2) probative.'" *Stratton*, 51 F. Supp. 3d at 218 (quoting *Pollard v. Halter*, 377 F.3d 183, 193 (2d Cir. 2004)).  "'The concept of materiality requires, in addition, a reasonable possibility that the new evidence would have influenced the [Commissioner] to decide claimant's application differently.'" *Id.* (quoting *Pollard*, 377 F.3d at 193).

## B.   Application

Plaintiff's first argument is that the Appeals Council did not properly consider two reports that plaintiff submitted from "treating physicians" after the ALJ issued his decision.  Plaintiff's counsel submitted two medical source statements ("MSS").  One MSS was written by Dr. Vincent J. Monastra, Ph.D., dated August 31, 2018. (T. 29-31). Dr. Monastra found "marked" limitations in plaintiff's abilities to maintain attention and concentration, perform activities within a reasonable schedule, maintain regular attendance or be punctual, complete a normal workday without interruptions from psychologically-based symptoms, perform at a consistent pace without an unreasonable number and length of rest periods, and respond appropriately to ordinary stressors in a work setting with "simple" tasks. (T. 30).  Dr. Monastra opined that plaintiff would have

"moderate" restrictions in the ability to interact with others.[7] (T. 30). Dr. Monastra also opined that plaintiff's impairments would cause her to be "off-task" more than 33% of the day and to be absent from work three or more days per month. (T. 31). Dr. Monastra also stated that the period covered by his report was "~9, 2004 to August 2018." (*Id.*)

The second MSS was dated August 13, 2018 and was authored by Clarence Mast, Jr., M.D. (T. 34-35). Dr. Mast's MSS listed a variety of impairments and/or symptoms, including chronic fatigue syndrome, severe joint pain, unsteady gait, brain fog/memory loss, stiffness, constant aching, clinical Lyme disease, Bartonella, Babesia, and profound weakness. (T. 34). Dr. Mast opined that plaintiff would be "off-task" more than 33% of the day and would be absent more than four days per month. (T. 34-35). Dr. Mast also stated in this check-box form that plaintiff could only sit for "1/4 hours"[8] out of an 8-hour day and should change position every 15-20 minutes. (T. 35). He also stated that plaintiff could stand/walk for "1/4 hours" out of an 8-hour day, and could only stand or walk 15-20 minutes. (*Id.*) Finally, Dr. Mast stated that plaintiff could only occasionally lift from "0-5 pounds." (*Id.*) He stated that the time period covered by his report was March 2016 to March 2022. (*Id.*)

In its April 8, 2019 decision, the Appeals Council stated that it found "no reason

---

[7] This category included the abilities to interact with the general public, to accept instructions and respond appropriately to criticism from supervisors, and to get along with co-workers. (T. 30).

[8] It is very unclear whether Dr. Mast actually means "one quarter" hour or one to four hours. Because if he means that plaintiff can only sit for 15 minutes in an 8-hour day, then the rest of his answers do not make sense. It would be unclear what plaintiff would be doing for the rest of the 7 hours and 45 minutes, and Dr. Mast's statement that plaintiff would have to alternate sitting and standing every 15-20 minutes would also not make sense.

to review" the ALJ's decision, making it the Commissioner's final decision. (T. 1).

Specifically, the Appeals Council stated:

> You submitted [a] statement from Clarence Mast, Jr., M.D.,
> dated August 13, 2018 . . . and [a] statement from Vincent
> Monastra, Ph.D., dated August 31, 2018 . . . . We find this
> evidence does not show a reasonable probability that it would
> change the outcome of the decision. We did not exhibit this
> evidence.

(T. 2). No further analysis was included with the Appeals Council decision. Plaintiff

argues that these doctors are treating physicians, the treating physician rule applies even

to evidence reviewed by the Appeals Council, and by failing to analyze these reports

under such rule, the Commissioner's decision is not supported by substantial evidence.

When a treating physician's opinion is submitted to the Appeals Council, it must

also apply the treating physician rule. *Patrick M. v. Saul*, No. 3:18-CV-290, 2019 WL

4071780, at *6 (N.D.N.Y. Aug. 28, 2019); *Thiboult v. Comm'r of Soc. Sec.*, No.

1:18-CV-00822, 2019 WL 7183419, at *4 (W.D.N.Y. Dec. 26, 2019) (citing *Newbury v.

Astrue*, 321 Fed. App'x 16 (2d Cir. 2009) (Summary Order)); *Kurten v. Comm'r of Soc.

Sec.*, No. 18-CV-174, 2019 WL 4643606, at *3 (W.D.N.Y. Sept. 24, 2019) (citing *Djuzo

v. Comm'r of Soc. Sec.*, No. 5:13-CV-272, 2014 WL 5823104, at *3 (N.D.N.Y. Nov. 7,

2014); *Asturias v. Colvin*, No. 13-CV-143, 2014 WL 3110028, at *5 (W.D.N.Y. July 7,

2014); *Toth v. Colvin*, No. 5:12-CV-1532, 2014 WL 421381, at *5 (N.D.N.Y. Feb. 4,

2014)). It is insufficient for the Appeals Council to state, without analysis, that the new

evidence would not change the outcome of the decision. *Id.*

In this case, without any explanation, the Appeals Council determined that the

newly submitted evidence would not have changed the ALJ's decision. It did not

express any analysis, let alone a treating physician analysis.  However, before the Appeals Council is required to do so, the court must determine whether the two reports were from "treating physicians."  Defendant does not appear to question that Dr. Mast may be a treating physician.  Defendant does argue that Dr. Monastra's opinion need not be afforded treating physician deference because he had only "limited interaction" with the plaintiff. (Def.'s Br. at 7-8).

There are no treatment records or progress notes from Dr. Mast in the transcript, other than the MSS submitted to the Appeals Council.  Thus, it is unclear how many times plaintiff saw this doctor or for how long she had been seeing him.[9]  Dr. Monastra saw plaintiff once to evaluate her on May 18, 2018, and once again to discuss her medication in June of 2018. (T. 775-86).  According to SSA regulations, a treating source is an "acceptable medical source who provides [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. § 404.1527(a)(2).  "Generally, a physician who has examined a claimant on one or two occasions is not considered a treating physician." *Ogirri v. Berryhill,* No. 16-CV-9143, 2018 WL 1115221, at *10 (S.D.N.Y. Feb. 28, 2018) (citing 20 C.F.R. § 404.1527(a)(2)); *accord, Cooper v. Saul*, No. 18 Civ. 9949, 2020 WL 1219252, at *12 (S.D.N.Y. Mar. 12, 2020) (collecting cases).  "However, there is no minimum number of visits or period of treatment by a physician before this standard is met." *Marte v. Berryhill*, No. 17-CV-3567, 2018 WL 2979475, at *15 (S.D.N.Y. June 14, 2018) (citing 20 C.F.R. § 404.1527(a)(2) (ongoing treatment relationship can be

___

[9] As stated below, Dr. Kimberly DeSantis mentioned in her May 14, 2018 report that plaintiff was seeing Dr. Mast. (T. 721).

established by medical source "who has treated or evaluated [the claimant] only a few times . . . if the nature and frequency of the treatment or evaluation is typical for [the claimant's] condition(s)"), report and recommendation adopted, 2018 WL 5255170 (S.D.N.Y. Oct. 22, 2018); *Ogirri v. Berryhill,* 2018 WL 1115221, at *10 (citing *Vasquez v. Colvin*, No. 14-CV-7194, 2015 WL 4399685, at *20 (S.D.N.Y. July 20, 2015) ("[C]ourts have held that SSA adjudicators should focus on the nature of the ongoing physician-treatment relationship, rather than its length."))

It is arguable that neither Dr. Mast, nor Dr. Monastra had achieved a sufficiently established relationship with plaintiff to be considered treating sources at the time they authored their MSS reports,[10] and therefore their reports would not be entitled to deference or "controlling weight."  Having said that, the court must still review all the evidence, including that submitted to the Appeal's Council, "and determine, as in every case, whether there is substantial evidence to support the decision of the [Commissioner]." *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996).

This court finds that although Dr. Mast's opinion would not have changed the ALJ's decision, the same cannot be said for the opinion of Dr. Monastra.  Dr. Mast's opinion is contradicted by almost every medical record in the administrative transcript. In fact, on May 14, 2018, Dr. Kimberly DeSantis, M.D., who had also recently begun seeing the plaintiff, stated that she was not in agreement with Dr. Mast's approach to

---

[10] Plaintiff testified that she had just begun seeing Dr. Monastra "toward the beginning of the month." (T. 51-52).  Plaintiff stated that she was looking for a primary care provider who would work with Dr. Monastra. (T. 52).  The record indicates that Dr. Monastra's evaluation was in May of 2018, the month prior to the ALJ's June 20, 2018 hearing. (T. 775-86).  Dr. Monastra may have subsequently become a treating physician, if plaintiff continued to treat with him.

either the diagnosis of Lyme disease or its treatment.[11] (T. 721).  Dr. DeSantis believed

that a lot of plaintiff's symptoms were "mood related." (*Id*.)  In addition, although Dr.

Mast wrote in his MSS that plaintiff had an unsteady gait, and that she could not sit,

stand, or walk for more than 15-20 minutes at a time, the plaintiff's musculoskeletal

findings were normal throughout the record, and she had a smooth, normal gait. (T. 720)

(*see e.g.* 238, 246, 255, 261, 269, 272, 274, 280, 286, 290, 292, 300, 370, 423, 425,

428).  At the hearing, plaintiff specifically conceded that this was not an exertional case.

(T. 44).  Counsel stated that there is not much of a sit, stand, lift issue in this case. (*Id.*)

Thus, Dr. Mast's opinion regarding plaintiff's exertional abilities would not have

changed the ALJ's decision regarding plaintiff's physical capacities and does not render

the decision unsupported by substantial evidence.

However, Dr. Monastra was the only mental health specialist who completed an

MSS that estimated plaintiff's mental RFC.  While Dr. Monastra only examined

plaintiff once and met with her a second time to discuss medication, plaintiff was just

beginning her treating relationship with him.  Dr. Monastra based his determination on

diagnostic testing, unlike any of the other opinions regarding plaintiff's mental

capacities.  Furthermore, he is a mental health specialist,[12] unlike all but one of the other

---

[11] The lab tests for Lyme disease were all negative. (T. 339, (8/10/15); 662 (9/2/15); 403 (4/20/17)).

[12] Plaintiff saw various family practice providers, including PA Anderson, Kimberly DeSantis, M.D., Susan Jackson, D.O., and counselors, Deanna Berman and Valerie Rosenfeld, who did not specifically opine on the degree of plaintiff's limitations.  Counselor Barbara Newcomb, although not an acceptable medical source stated in 2014 (prior to the plaintiff's onset date), that plaintiff's concentration was "poor." (T. 756).  Plaintiff was examined by Dr. Sobia Mirza, M.D., a psychiatrist who saw plaintiff once on October 15, 2015, and who stated that plaintiff's affect was full, her memory was good, and her attention and concentration were "good." (T. 800).  There are other reports from Dr. Mirza's office, but they are written by LCSW Cathy Osgood or LMSW Megan Hagerbaumer. (T. 798,

providers who opined on plaintiff's mental condition.  Given the limited mental health opinion evidence of record, substantial evidence did not support the Appeals Council's cryptic conclusion that  Dr. Monastra's restrictive findings regarding plaintiff's mental RFC could not have changed the ALJ's determination.

In making his RFC determination, the ALJ relied heavily on plaintiff's treating Physician's Assistant ("PA"), Susan Anderson,[13] who submitted an MSS which stated that plaintiff would only be "off task" 10% of the day and would be absent once or less per month. (T. 16-17, 545-47).  However, the first page of PA Anderson's MSS states that she evaluated plaintiff for "muscle spasms." (T. 545).  The ALJ assumed that PA Anderson's MSS applied to all the conditions for which she examined the plaintiff, including her mental impairments, but that is not what the form states. (T. 545).

The ALJ stated that his RFC, based on PA Anderson's MSS, was "consistent with the claimant's mental status exams (1F, 4-5F, 11-12F, 15-16F, 20F) and accounts for Ms. Anderson's opinion regarding the claimant's propensity for being off-task and absent from work (8F)." (T. 17).  While the ALJ's citation to the "mental status exams" is correct, these are general family practice examinations, some of which do not relate specifically to plaintiff's mental condition, and some of which refer only tangentially to "psychiatric" conditions in a list of physical examination categories. (*See e.g.* 238, 246

---

802, 804-806).  Plaintiff was discharged from Dr. Mirza's practice because plaintiff did not agree with the doctor's treatment recommendations. (T. 799-801).  In any event, Dr. Mirza did not evaluate the plaintiff's ADHD, which was diagnosed by Dr. Monastra three years later in May of 2018, and which would necessarily be relevant to attention and concentration.

[13] The court must also point out that, at the time of the ALJ's decision, PA Anderson was not an "acceptable medical source" for purposes of diagnosing an impairment, but the physician assistant's opinion could be considered for purposes of assessing the severity of symptoms and the resulting limitations on functional capacity. *Eusepi v. Colvin*, 595 F. App'x 7, 8-9 (2d Cir. 2014).

(Ex. 1(F)).  Even within the general reports cited by the ALJ, there are references to "abnormal" mental status findings. (*See e.g.* T. 430 (Ex. 4(F)) - referring to plaintiff's mental status as "abnormal" and to her mood and affect as "empty, flat, quiet, and sad.")

In this group of exhibits that he cites as "consistent" with PA Anderson's MSS, the ALJ does not include Dr. Monastra's original report which explained the specific diagnostic testing that he utilized in evaluating the plaintiff's ADHD. (T. 775-86 (Ex. 17(F)).  Since the determination of whether an individual is off-task may be related to her attention and concentration,[14] it is unclear why the ALJ did not mention this report in determining plaintiff's RFC, when he clearly considered Dr. Monastra's evaluation in determining that plaintiff's ADHD was a severe impairment.[15]

While the ALJ is not required to reconcile every shred of evidence in his decision, neither may he pick and choose only the evidence favorable to the Commissioner. *Sutherland v. Barnhart*, 322 F. Supp. 2d 282, 289 (E.D.N.Y. 2004) ("It is not proper for the ALJ to simply pick and choose from the transcript only such evidence that supports his determination, without affording consideration to evidence supporting the plaintiff's claims"); *Cruz v. Barnhart*, 343 F. Supp. 2d at 224.  In *Stacey v. Comm'r of Soc. Sec.*, 799 F. App'x 7, 10 (2d Cir. 2020), the court "cautioned against scouring medical notes

---

[14] As stated above, in addition to plaintiff's propensity to be off-task and absent, Dr. Monastra also found that plaintiff would have "marked" limitations in maintaining attention and concentration, in the ability to perform activities within a schedule and/or be punctual within customary tolerances, and complete a normal workday without distractions and to perform at a consistent pace without an unreasonable number of rest periods. (T. 30).  He also found marked limitations in plaintiff's ability to respond appropriately to ordinary stressors at work, even with simple tasks. (*Id.*)

[15] The reports cited by the ALJ in making his RFC finding, for the most part, related only to her depression and anxiety.

to draw their own conclusions based on isolated descriptions."

While the ALJ's failure to mention Dr. Monastra's report may have been harmless based on the record before the ALJ, this court finds that the addition of Dr. Monastra's MSS could have changed the result of the ALJ's RFC analysis, given that the MSS is based, in part, on mental testing for plaintiff's ADHD.[16]  This is particularly true when the ALJ's analysis of PA Anderson's MSS may have been based on a mistaken assumption.[17]  The Appeals Council's determination that Dr. Monastra's MSS would not have change the ALJ's determination is not supported by substantial evidence.

## V.    Nature of Remand

### A.    Legal Standards

"When there are gaps in the administrative record or the ALJ has applied an improper legal standard . . . remand to the Secretary for further development of the evidence" is generally appropriate. *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980).

### B.    Application

This Court cannot conclude that "substantial evidence on the record as a whole

---

[16] As plaintiff points out, medical opinions may be formed based on both medical testing and the patient's subjective description of her symptoms. (Pl.'s Reply Br. at 4) (citing *Stacey v. Comm'r of Soc. Sec.*, 799 F. App'x at 9).  Here, Dr. Monastra's opinion was based on both testing and plaintiff's description of her symptoms.

[17] Plaintiff also argues that the ALJ misstated the record when he found that plaintiff "admitted" that she took no medication for her depression, and that her primary care provider prescribed the medication that she took for anxiety. (Point III, Pl.'s Br. at 14).  While the ALJ did not actually "misstate" the record, the implication that plaintiff's depression was not limiting because she took no medication may be misleading.  Plaintiff also testified that she had been "on lists of medication" for depression and anxiety (T. 52), but that none of them worked (T. 797), to the point where she tried Electro Convulsive Therapy ("ECT") (T. 655-60), which also failed to alleviate her symptoms.

indicates that the [plaintiff] is disabled[,]" and thus, I cannot recommend a remand solely for the determination of benefits. *See Bush v. Shalala*, 94 F.3d 40, 46 (2d Cir. 1996).  Notwithstanding the new evidence, the Commissioner must still determine the plaintiff's RFC based on an analysis of the entire record, and there are other factors that may be considered in making that determination that the Commissioner must do in the first instance.  Accordingly, I will order a remand for further consideration of Dr. Monastra's MSS based on the proper standards.

Because the court is remanding for proper consideration of Dr. Monastra's MSS, the court need not consider plaintiff's follow-up argument that the ALJ fails to account for plaintiff's limitations in responding appropriately to stressors in a work setting with simple tasks, which is listed as a "marked" limitation in Dr. Monastra's MSS.  Finally, the court also need not consider the plaintiff's remaining arguments (Points III, V, VI), including her step five argument because they are based upon the ALJ's erroneous RFC determination, which should be revisited upon remand.

**WHEREFORE,** based on the findings above, it is hereby

**ORDERED**, that the decision of the Commissioner is **REVERSED** and this case **REMANDED**, pursuant to **sentence four of 42 U.S.C. § 405(g)**, for a proper analysis of the new evidence from Dr. Monastra, together with any further analysis consistent with the court's decision.

Dated: May 12, 2020

Andrew T. Baxter
U.S. Magistrate Judge